We'll move now to our second case of the day, appeal number 23-3162. It's Gilbert v. Lands' End. All right, we will welcome Mr. Gowdy to the podium. Good morning, may it please the court, Brian Gowdy on behalf of the 605 former or current Delta employees that claim acute injuries caused by Lands' End uniforms. I will be having seven minutes with three of rebuttal, and then Mr. Nagel, who's on Zoom, will have five minutes for the Gilbert appellants. For the Andrews appellants, my clients, there's three sub-issues on the summary judgment order. One, was there admissible evidence of a manufacturing defect in the uniforms? Two, was there admissible evidence of general causation? That is, was there evidence that the plaintiff's injuries could have been caused by the uniforms? Were the uniforms capable of causing the injuries? And three, should this court consider specific causation in the first instance or remand to the district court on that issue? Of course, you would need to reverse on the first two issues to get to the third issue. With my limited time, I really want to talk about the second issue, which deals mainly with Dr. Freeman and his exclusion. His admission is critical for both the first and second issues, and the heart of the win here for Lansin was they were able to exclude Dr. Freeman. And I would just like the court to take a careful look at the briefs. In some ways, there are ships passing in the night, and I would submit that's because Lansin is not confronting the evidence that was in the record and that is stated in the blue brief. As a first example, dealing with the association factor under the Bradford Hill method that Dr. Freeman used. As we say in the blue brief, he did identify an association. We all agree what that means. At page 13 of the district court order, it cites page 566 of the scientific manual, and it states there, an association between exposure to an agent and disease exists when they occur together more frequently than one would expect by chance. Well, Dr. Freeman did an analysis that showed that before the employees were wearing the uniforms, and this was based on questionnaires that were sent to over 900 employees, that the average number of symptoms was .15. After wearing the uniforms, the average number of symptoms was 2.70. That difference, and he says this right in his report, at doc 173, pages 20 and 21, that difference of 2.55 is statistically significant. That's mentioned in our blue brief. That is not addressed in the reply brief, other than in a footnote, and the argument that they make is, well, that just deals with temporality, and if you read the scientific and they are related, and in his report, yes, it was under a heading dealing with temporality, but Dr. Freeman expressly said that this shows a quote, strong association, because the number of symptoms, and I'm paraphrasing, but it's on pages 20, 21, the number of symptoms after the exposure was 18 times greater than before the exposure. That's in his report. That's not in the district court's order. That is not addressed in Lansin's brief. They want to act, both they and the district court, respectfully, acted like that evidence wasn't there. As another example, Dr. Freeman noted that 48% of the employees' symptoms resolved after they stopped wearing the uniforms. I would like to point out that this is not a case where we're dealing with cancer or some of the more complex issues when we're dealing with causation. These are acute injuries, and in some ways, this is common sense. We're getting close to the holidays. I have one of those itchy sweaters. I know that when I wear it, my skin gets really itchy, and then when I stop wearing, it doesn't, and that's what all of our clients notice, not just itchiness. It was far more serious than that. I'm trying to give you an example that you might be able to relate to at this time of year. This is, when I'm wearing the uniform, I have these problems. I stop wearing the uniform. I stop having the problems. In fact, what Dr. Freeman said, again, and this is not addressed in the red brief, not addressed in the district court's order, employees who wore the uniform more than four times per week had a mean of 4.38 symptoms and 2.75 systems, compared to those who wore the uniform less than four times per week had a mean of 3.72 symptoms and 2.48 systems. Simply stated, the more that you wore the uniform, the sicker you got. Let me, I know you wanted to spend most of your time on causation, but I need to ask you about defect. Yes, ma'am. As well. Does any amount of crocking constitute a defect under the Uniform Apparel Act? Does any amount of crocking? I would say that you have to show under the law that a defect is unreasonably dangerous. So that's why we've made it clear. We're not relying just on Dr. Hauser's testimony about the crocking, but also the dangers that the crocking caused, which is why we point to the other three experts' testimony that talks about these materials, how they're toxic, and in particular, Dr. Freeman. But is there any evidence that goes to that factor of unreasonable dangerousness? There is a lot in the record that says these other elements are present. Is there anything that suggests that they rose to the level, kind of that second piece of strict liability, that it rose to the level of being unreasonably dangerous? Yes, I would say the other three experts, including Dr. Freeman. I mean, if wearing a uniform gets you sick, that's... That's causation. We're moving to... We're wanting to back up and talk about the defect. I think they're related, Your Honor. Because the... I mean, and it's sort of... I think in common parlance, we think of defect as, you know, the product was made incorrectly. So, you know, if, for example, my coffee machine makes cold coffee, well, that's a defect and I get my money back, but I'm probably not going to get hurt from that. But if my coffee machine makes coffee that's 250 degrees and I get hurt, well, that's unreasonably dangerous. So, I would agree with you that just showing crocking alone doesn't get you there. One of the things that a... We're still... Based on the procedural, where this case was, right? Yes. We're trying to make this logical, going back to the evidence. Right. What was the evidence, using your example of the itchy sweater? Not to overshare, okay? Let's say the itchy sweater has three holes in your itchy sweater instead of two. It's defective because there's three and I got two arms. Right. What evidence makes it, though, unreasonably dangerous? The questionnaires that our clients answered showing that they were getting injured from these uniforms and Dr. Freeman's analysis of that as an epidemiologist. You shouldn't get sick from wearing a uniform for work. And yes, that also goes to causation. The same evidence. I mean, it makes sense. If you're going to say a product's dangerous, that's also going to bleed into the causation analysis. So, that's the evidence, Your Honor. It's all the questionnaires that our clients answered about their illnesses and Dr. Freeman's analysis of that, as well as, I'd say, the other two experts pointed out and the lab reports. I shouldn't forget that. The lab reports that Dr. Freeman and the other experts looked at shows that these have toxic materials and that the labs, I'm sorry, not the labs, the mills, overseas mills who produced these did not properly wash them or scour them and that caused the crocking and you see the pictures on a brief. So, don't you think we're kind of making a leap because the water-resistant, you have these elements in all of the clothing. It's not the fact that the elements are present. It's the question I'm asking is what evidence is there in the record that those elements rose to the level of being unreasonably dangerous? What happened to our clients? That's the best evidence. So, I've kind of eaten all my rebuttal time. I'm happy to answer any questions. We'll give you a couple minutes when you return. Thank you very much, Your Honor. Mr. Nagel. I'm not able to hear him on my end. Your Honor, am I coming through now? You are. Thank you. Thank you so much. Shall I proceed? Yes, please. Thank you so much. I am Bruce Nagel, and I represent the class of those affected, stewardess and other Delta employees who had defective uniforms and were denied any right to return or any satisfaction under the 100 percent guarantee for the particular item. There are three undisputed facts that were ignored or overlooked or not addressed by the district court, which I believe defeat summary judgment. And those facts are as follows. Number one, the warranty issue was included in a confidential agreement only between Land's End and Delta and was never given to the Delta employees. They did not know what the terms were. Number two, Land's End prepared a series of talking points which changed the terms of the warranty and only provided for an exchange of the uniforms and did not perform, did not provide for a refund or a credit as the original guarantee did. And in the talking points, which was the only substantive issue, substantive language that was provided to the employees, there was no requirement that there had to be a form submitted along with the claim. And in the talking points, which is overlooked and not even mentioned in the district court opinion, the talking points themselves said, in quote, if you are not happy with the garment, there are two words to help you rest easy, guaranteed, period. That's it. There was no reference whatsoever about mechanism of return. There was no mention whatsoever that they were entitled to a credit or refund of the money. And the third key fact that was overlooked by the trial judge is the fact that the warranty provided that in the event of a return of the garment, it had to be done with a form, in quote, to be mutually agreed upon by the parties. That form is not in the record below. And it's a material factual issue as to whether that form ever existed because the warranty itself said it had to be mutually agreed upon by the parties. And there is no evidence in the record below that that ever was accomplished. So now, with those three key facts, which inform us in terms of the law, which was not also addressed by the district court, and I believe informs us in terms of the endgame with the jury as to why summary judgment was improvidently granted. With those facts, the jury would have to address Delaware provision section 2, 316.1, which specifically invalidates limitations on warranties and says they are enforceable only if reasonable. So the jury ultimately needs to decide in this case, were the limitations contained in the warranty unreasonable? And the three facts that I just recited to your honor, which your honors, which were in the record and yet not dealt with in the district court opinion, all are factual issues that need to be considered in arriving at the ultimate issue of reasonableness. And in this case, the jury would be charged that A, under Delaware law, warranty provisions are liberally construed in favor of protecting employees. They would have in the record before them the fact that the talking points modified the warranty, number one, and that potentially under estoppel law, Land's End would be a form enforcing the limitations of the warranty, A, because they were modified, and B, because they never provided the warranty itself to our employees. And number three, they have to decide whether the three limitations in the warranty would be enforceable at all. Limitation number one, perhaps they'll decide there was no form, so you couldn't use that. Perhaps they'll decide the idea that you had to be a current employee was unreasonable. And number three, they may decide that the idea of returning a defective product is also unreasonable. So ultimately, the three conditions that they argue were not met here, those three conditions are all jury questions and all are based upon the three factual issues that I referred to. The district court erred by not even making any findings with regard to the three facts I listed and not even analyzing section 2-316.1 of the Delaware law, which specifically invalidates limitations on warranties. Thank you. Thank you, Mr. Nagel. We welcome Ms. Williams to the podium. Good morning. May it please the court. My name is Gwen Williams, and I represent the Appalachian Lands End. I will, I think, quickly address the points as to the warranty issues that were just being argued. I think we can probably deal with those quickly, and then I'll save more of my time to deal with the personal injury if that order works for the court. So as to the warranty issue that was just argued, it's undisputed that no plaintiff, not a single one, tried to return a Lands End garment and was refused a refund or exchange. And my opponent focused some of his argument on his argument that, well, the employees weren't given notice of the warranty provision. First of all, many, you know, any number of Delta employees did decide to return their garments, and the testimony in the record was unanimously that people who did decide to return their garment had no problem accomplishing that. The process was simple and easy. But at the very latest, all of the plaintiffs had notice of the warranty's requirements when Plaintiff's Counsel sent Lands End's counsel a demand for a refund under the warranty. And he received in response an explanation that said, no, you have to comply with the terms of the warranty, which expressly say that your clients would need to return the garments. He never responded to that letter, and no plaintiff after that point in time tried and was refused the ability to return their garment. And then quickly as to the talking points that were referenced, there is actually no evidence in the record that that information was ever given to the Delta employees. If the court actually looks at that piece of evidence, which you can find at docket 130-4, it's an internal email amongst Delta employees, and it actually says itself, this document is intended for leaders only. Please don't share it forward. So in other words, these were talking points that were going to leaders of teams of flight attendants. Mr. Nagle is using that as evidence of what the employees were then told, what information they had since they were intended beneficiaries who may not have seen the contract. Sure. So my first point is there's actually no evidence in the record that they did receive that information. No plaintiff testified that she had heard those talking points or had any confusion as to that. But even beyond that, even if it's credited that every single employee did get that information, the fundamental point is still in those talking points. You have to return the garment. I think in today's day and age, I think people are pretty familiar with the concept that if you're unhappy with a consumer product that you bought, you're going to have to return the product. You can't just go say, I'm going to keep the product, but I want you to get my money back. That's just not the way it works. So unless there are other questions on the warranty issue, I will then turn to the personal injury claims. Real quickly on the crocking subclass.  There's no individual plaintiffs left, is there? As to the property damage claims? Yes. That's right, Your Honor. The property damage claims have all been resolved, either because of a settlement or because people who had, the court below gave every plaintiff a period of time to come forward and state if he or she intended to assert a property damage claim because that wasn't clear from the complaint. So they had time to come forward. If they didn't come forward saying, yes, I want to pursue a property damage claim, those claims were dismissed with prejudice. All the rest of the claims were then settled. So there are no property damage claims left in the case.  So as to the personal injury claims, the court focused its questions on existence of defect. So maybe I'll start there and then turn to causation. First of all, I guess I'd like to say the plaintiffs do not dispute that they need expert evidence on defect and causation, both general and specific. Now, as to the defect, they have no expert testimony that could allow a jury to find that any garment without a dye transfer problem was defective. And the undisputed evidence is that many of the nearly 100 garments in the uniform line worn by the plaintiffs had no crocking or dye transfer problems. Mr. Hauser, their textiles expert, he was quite clear that his opinion related to the situation where the purple dye would transfer. It would rub off on your skin or perhaps your undergarments, and that when that happened, when the dye transferred, the dye carried with it, could carry with it, and did in certain occasions, certain chemicals. And he identified four specific chemicals, and only four. And that is the only, and he testified, that makes the product defective. There was lab testing that showed that certain garments had other levels of chemicals, some of which exceeded industry standards, some of which did not. But there was no testimony from Mr. Hauser or from Dr. Freeman, who wouldn't be qualified as an expert on defect anyway. There was no evidence that the presence of any of those other chemicals in any other garments besides the purple dye transfer issue, that that was a product defect. And what the plaintiffs claim essentially is, is it's just a post hoc theory. I wore the garment, I experienced some symptoms, it must have been something in the garment. And although my opponent argues that, you know, this is sort of common sense, we've all had the experience of wearing a sweater that's itchy, he actually really minimizes the claims of many of his clients, because they're not just about experiencing some itchiness or some skin rash. The range of ailments that were put forth by the nearly 600 different plaintiffs, collectively between them, it was nearly 40 different ailments. And it's not just skin rashes. It was asthma, it was upper respiratory infections, it was hair loss, it was shortness of breath and heart palpitations. Those are not the kind of things that a jury could just draw on its own common sense and say, well, yeah, it must have been because they wore these garments. As to then some of the points that my opponent made regarding the exclusion of Dr. Freeman's testimony, he focused for one point on the association issue under the Bradford Hill test. And I just wanted to clarify what the argument is as to Dr. Freeman's failure to properly satisfy. Can I just back you up for a minute on the general causation question?  Is there any evidence to suggest out of the four chemicals that were identified by the expert, that any of those four, just those four, rose to the level of being unreasonably dangerous? Well, no, Your Honor. And they don't have anything to link those chemicals to the ailments. In other words, it's not enough to say, well, there were a whole bunch of chemicals, and altogether these chemicals could cause this large number of possible symptoms. You'd have to actually say, okay, what we have here is this garment that this person wore, when the dye transferred, it transferred these four chemicals. And those four chemicals were at a level that was dangerous. And, of course, those four chemicals actually could cause, for instance, if the person's claiming hair loss. That second piece that I'm asking, I'm trying to figure out, is that link in the evidence? And so what was very interesting was my opponent argued multiple times to Your Honor about the three experts. Well, I'd like to point out that two of the experts, Dr. Scheinman and Dr. Apple, they didn't appeal the court's exclusion of those experts. So Dr. Apple was the toxicologist who, at least to some extent, purported to get to that aspect that Your Honor is talking about, right, the toxicology of it. And I think the district court's decision discussed in length, and I think quite convincingly, why Dr. Apple's testimony as a toxicologist, it's the right kind of expert, but his analysis was completely lacking. And, again, the plaintiffs did not appeal the exclusion of the toxicologist or the dermatologist. The only piece of the expert opinion that they appealed was the court's exclusion of Dr. Freeman's general causation testimony. And while I'm on that topic, I would just like to note, as a bit of an aside, that Dr. Freeman purported to offer expert testimony as to both general and specific causation. The court excluded, the court below excluded both general and excluded everything, so general and specific causation evidence from Dr. Freeman. And on appeal, the plaintiffs only argue that the exclusion of the general causation evidence was manifestly in error, not the specific causation. But tell me this. Should the district court have considered Dr. Freeman's opinions about specific causation? No, Your Honor. It was also wholly lacking for a whole host of reasons. The way in which he considered specific causation was through application of something called the Naranjo algorithm, which basically consists of sort of looking at the records that he had for each plaintiff, which were just these questionnaires, and sort of assigning a number of points based on certain criteria. And then if you're over a certain number of points, you can say, well, then that gets me to causation. As he admitted in his deposition, that algorithm has never been used outside of the context of adverse drug reactions. It's a totally different kind of analysis. He could provide no support for the notion that you could use it to determine specific causation in the context of a toxic tort case like this. Further, although her testimony was excluded, Dr. Scheinman, the dermatologist, who was certainly a very well-qualified dermatologist, spoke at length about what it is, at least as to things that fell within her area, dermatological issues, what it is that you would actually have to do to determine specific causation. She was quite clear that she would never try to determine specific causation for a dermatological condition without having much more information than Dr. Freeman had. She talked about how she would want to take a medical history. She would want to talk to the plaintiff herself. I think she said that she'd never tried to do it from just looking at medical records taken by somebody, by a different doctor. And Dr. Freeman didn't even look at the medical records. They were available. Many medical records had already been collected by that point in time. He did not go to the medical records. He just used the questionnaire information. So there's a host of reasons why the court was correct in excluding the specific causation opinion as well. And the specific causation opinions were, there was some of it in each of Dr. Scheinman, Dr. Appel, and then that portion of Dr. Freeman's testimony. So by excluding those three experts, specific causation evidence was excluded. All of the expert testimony was excluded, and that would leave only the relatively small number of plaintiffs who had also come forward with treating physician disclosures. I know you had mentioned that in your briefing that any of the 50 states, as far as defect, are you conceding that Wisconsin law would apply here? For purposes of the argument, I think it's a perfectly reasonable conclusion. I mean, if we were to go to trial as to any particular plaintiff, if he or she did not live in Wisconsin, I think it would be a valid choice of law question at that point in time about which law should govern this particular plaintiff's claim. But the district court concluded that it didn't need to get into really the choice of law question because as to the existence of defect and causation, the law was similar enough in every jurisdiction that it could just apply Wisconsin law, and we did not take issue with that. I would note on that just that the plaintiffs in their briefing tried to make much of the fact that Wisconsin uses a consumer contemplation test for defect, and I would just want to point out that that test, perhaps somewhat misleadingly named, doesn't mean that it is enough to establish defect by a plaintiff simply saying, I used this product and it was more dangerous than I thought, so therefore it's defective. And in fact, the case that's discussed in the briefing about this, the case against Smith and Nephew, the latex glove case, in that case there was substantial expert evidence about the product, about the characteristics of latex, about whether latex could give rise to allergies. It was not simply that the jury was being asked to just sort of decide whether this particular nurse who had developed an allergy, whether she herself subjectively thought that the product was more dangerous than she had contemplated. That's not what that test means. All right. Thank you. Mr. Gowdy, we'll give you two minutes. Thank you. May it please the Court. A lot of the statements you heard were many but not all, some of which exceeded industry standards. Besides the purple transfer, the arguments you heard were as if this was a class action. This is about 605 individual plaintiffs. And so they want to say, well, maybe most of the people didn't have a problem. When we get down to the specific causation analysis and the trial, we'll see which of these 605 plaintiffs have it. The summary judgment was simply on defect in general causation. The judge did not rule on specific causation. I wanted to also point out that they have again misstated that Dr. Freeman relied on the algorithm, the alternative method, for only specific causation. He was very clear in his report that he was doing it for both general and specific causation. And the district court failed to know that. It skipped over the whole general causation opinion in his order, and they've done it again here. They don't want to look at that part. And that was alternative to the Bradford-Hill method. And it's not even addressed in the order. The order just addresses his specific causation opinion under the algorithm. And their brief does the same thing. And their argument that they just had. Just skip over that. It's in there where we've cited it. The other, as far as what we're not appealing, it's true we're not appealing the exclusion of the causation opinions of two of the experts. But the district judge never excluded their opinions or Dr. Freeman's opinions about the toxicity of what's in these uniforms. That wasn't excluded. What was excluded were the causation opinions. And there's abundant... I also wanted to get back to your four elements. Dr. Hauser, I just reread it as I was sitting over there, he notes that in one of the tests... Oh, I'm on my red light. So if you could reread it closely, he notes that one of the tests has those four. But we don't know. We just know there was crocking. And there was all these elements. And you can look in Dr. Freeman's report. He lists the elements. So thank you for the time today. Thank you. We will take the appeal under advisement.